## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Michael B.,[1] | ) | C/A No.: 1:20-1999-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable R. Brian Harwell, United States District Judge, dated July 6, 2020, referring this matter for disposition. [ECF No. 6]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 5].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for an award of benefits pursuant to sentence four of 42 U.S.C. § 405(g).

I.    Relevant Background

A.    Procedural History

On November 20, 2013, Plaintiff protectively filed an application for DIB in which he alleged his disability began on April 13, 2012. Tr. at 47, 150–53. His application was denied in a Notice of Disapproved Claim dated March 13, 2014. Tr. at 58–69. On February 10, 2016, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Carl B. Watson. Tr. at 33–46 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 23, 2016, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 16–32. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6.

Thereafter, Plaintiff brought an action seeking judicial review of the Commissioner's decision. On July 23, 2018, the undersigned issued an order granting the Commissioner's motion to remand the case for further administrative proceedings. Tr. at 482–86. The Appeals Council subsequently issued an order remanding the case to the ALJ on September 21, 2018. Tr. at

487–91. On December 3, 2019, Plaintiff appeared for a second hearing before the ALJ. Tr. at 436–58 (Hr'g Tr.). The ALJ issued a second unfavorable decision on February 10, 2020, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 418–35. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 26, 2020. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 58 years old at the time of the first hearing and 61 years old at the time of the second. Tr. at 37, 436. He completed high school. Tr. at 37. His past relevant work ("PRW") was as a garbage truck driver. *Id.* He alleges he has been unable to work since January 5, 2013.[2] Tr. at 440.

2.    Medical History

Plaintiff presented to Scott M. Levin, M.D. ("Dr. Levin"), for evaluation of low back pain on April 23, 2012. Tr. at 260. He indicated he had been experiencing the pain for about a year and that his job as a truck driver aggravated his symptoms. *Id.* Dr. Levin noted forward bending of the lumbar spine to about 80 degrees with mild discomfort involving the left side of the lower back. Tr. at 261. He stated Plaintiff had lumbar extension to 10 degrees with no significant pain. *Id.* Plaintiff demonstrated 5/5 lower extremity

---

[2] Plaintiff amended his alleged onset date to coincide with his 55th birthday. Tr. at 440, 616–19.

strength and equal and intact bilateral reflexes. *Id.* A straight-leg raising ("SLR") test was negative bilaterally. *Id.* X-rays showed some degenerative disc disease ("DDD") with grade I L5 on S1 spondylolisthesis. *Id.* Dr. Levin referred Plaintiff to physical therapy ("PT"), ordered an MRI scan of the lumbar spine, and indicated he should remain out of work pending the results. Tr. at 262.

On May 21, 2012, Plaintiff endorsed improvement from PT, but complained of occasional shooting pain down his left leg. Tr. at 255. Dr. Levin noted negative SLR test, 5/5 lower extremity strength, normal sensation in the lower extremities, and tenderness only in the left paraspinal lumbar muscles. *Id.* He reviewed the MRI report that showed DDD, a left lateral disc protrusion at L2–3 that abutted the exiting left L2 nerve root, a broad-based right lateral disc/osteophyte complex that abutted the right L4 nerve root, and a broad-based right lateral/paracentral disc protrusion at L5–S1 that abutted the central right S1 nerve root. *Id.* Dr. Levin referred Plaintiff for four additional weeks of PT. *Id.* He discussed a pain management referral, but Plaintiff indicated he did not need it. Tr. at 256.

On June 25, 2012, Plaintiff reported some improvement from PT, but continued to endorse non-radicular pain in his left lower back. Tr. at 254. Dr. Levin observed tenderness in the left paraspinal lumbar muscles, but 5/5 strength of the lower extremities, equal and intact bilateral sensation, and no

tenderness of the midline or right paraspinal lumbar muscles. *Id.* He indicated Plaintiff should complete PT and transition to a home exercise program, but that he did not require pain management treatment. *Id.* He wrote: "He will continue to remain out of work as the vibrations of the truck and the lifting and carrying activities that he has to do will likely not be very well tolerated by the patient." *Id.* He provided Plaintiff with an elastic lumbar corset for support and instructed him follow up if his pain worsened such that he required a referral to a pain management specialist. *Id.*

On August 15, 2013, Plaintiff presented to Salvatore M. Buffa, M.D. ("Dr. Buffa"), for a preoperative exam in preparation for a screening colonoscopy. Tr. at 274. Dr. Buffa recorded normal findings on exam. Tr. at 275. He advised Plaintiff to increase fiber in his diet and recommended a colonoscopy. *Id.*

Plaintiff reported doing well and denied complaints on August 19, 2013. Tr. at 269. He requested medication refills. *Id.* Amy Jo Kelly, FNP ("NP Kelly"), noted normal findings on exam. Tr. at 269. She reviewed lab studies and prescribed Bisoprolol-Hydrochlorothiazide for hypertension, Simvastatin 80 mg for hyperlipidemia, and Ranitidine HCl 150 mg for gastroesophageal reflux disease ("GERD"). Tr. at 270–71.

On August 21, 2013, Dr. Buffa performed a screening colonoscopy that showed internal hemorrhoids and diverticulosis of the colon. Tr. at 277.

Plaintiff presented to Mark Foster, M.D. ("Dr. Foster"), for a flu shot on October 30, 2013. Tr. at 267. He weighed 245 pounds, which represented a 13-pound weight gain. *Id.* He reported doing well and denied concerns. *Id.*

Plaintiff presented to Gilbert Jenouri, M.D. ("Dr. Jenouri"), for an orthopedic consultative examination on March 3, 2014. Tr. at 279–81. He described dull, aching lower back pain that ranged from a two to a seven on a 10-point scale. Tr. at 279. He denied radiation of the pain and said it was increased by activity. *Id.* He reported cooking five to seven times a week, cleaning twice a week, doing laundry three to four times a week, and shopping twice a week. *Id.* He stated he showered and dressed daily and engaged in activities that included watching television, listening to the radio, reading, dining in restaurants, playing sports, and socializing with friends. *Id.* Dr. Jenouri observed Plaintiff to have normal gait, to walk on his heels and toes without difficulty, to rise and squat without difficulty, to have 5/5 grip strength, and to have full ROM of the cervical spine, shoulders, elbows, forearms, wrists, and fingers. Tr. at 280. He noted lumbosacral extension to 25 degrees, flexion to 80 degrees, and bilateral lateral flexion to 30 degrees. *Id.* He found no spasm, scoliosis, kyphosis, or spinal, paraspinal, sacroiliac joint, or sciatic notch tenderness. *Id.* He noted negative SLR test, except for in the seated position on the left. *Id.* He recorded the following ROM in Plaintiff's hip: bilateral flexion/extension to 90 degrees; bilateral backward

extension to 30 degrees; right abduction to 35 degrees; left abduction to 40 degrees; right adduction to 15 degrees; left adduction to 20 degrees; and normal bilateral interior and exterior rotation. Tr. at 280–81. He noted full ROM on flexion and extension of the bilateral knees and dorsiflexion and plantar flexion of the bilateral ankles. Tr. at 281. He stated plaintiff had 5/5 strength in his bilateral proximal and distal muscles and equal reflexes. *Id.* He appreciated no muscle atrophy, sensory abnormality, joint effusion, inflammation, or instability. *Id.* He diagnosed low back pain and hypertension and found "[n]o restrictions based upon the findings of today's evaluation." *Id.*

Plaintiff sought medication refills on March 4, 2014. Tr. at 302. He indicated he was doing well and denied complaints. *Id.* NP Kelly recorded normal findings on physical exam. Tr. at 303.

Plaintiff followed up with NP Kelly for medication refills on June 16, 2014. Tr. at 282. He reported doing well and denied complaints. *Id.* NP Kelly recorded normal findings on exam, aside from a cardiac arrhythmia. Tr. at 283. An electrocardiogram ("EKG") was benign. *Id.* NP Kelly prescribed Simvastatin 20 mg for hyperlipidemia and Bisoprolol-Hydrochlorothiazide 2.5-6.25 mg for hypertension and instructed Plaintiff to continue his other medications. *Id.* She noted Plaintiff was scheduled to follow up with a urologist for possible kidney stones. *Id.*

Plaintiff presented to Marylu Williams, FNP-C ("NP Williams"), for a urological evaluation on June 17, 2014. Tr. at 291. He complained of flank pain. *Id.* NP Williams noted normal findings on exam. Tr. at 292. She assessed a urinary tract infection ("UTI") and instructed Plaintiff to continue taking Cipro 500 mg twice a day until it was gone and to follow up in a week. *Id.*

Plaintiff followed up with NP Williams on June 24, 2014. Tr. at 288. He reported feeling well after having finished Cipro. *Id.* NP Williams noted Plaintiff had a two-centimeter cyst on his left kidney that required visualization with a contrast computed tomography ("CT") scan. *Id.* She noted normal findings on exam. Tr. at 289. She assessed a UTI and ordered a CT urogram. *Id.*

Plaintiff presented to Mary Jane Mason, M.D. ("Dr. Mason"), as a new patient on November 4, 2014. Tr. at 339. He sought to establish care after having moved from New York to South Carolina. Tr. at 340. He complained of a cramp-like pain below the bottom rib on his right side that was exacerbated by twisting and reaching up. *Id.* He also reported osteoarthritis in his lower back with herniated lumbar discs. *Id.* He stated his orthopedist had not recommended intervention. *Id.* Dr. Mason recorded normal findings on exam. Tr. at 341. She indicated Plaintiff's right flank pain was likely a pinched nerve or pulled muscle and recommended walking and regular activity. *Id.*

She ordered lab studies, prescribed Tramadol 50 mg for lumbar pain, and referred Plaintiff to a urologist. *Id.*

Plaintiff followed up with Dr. Mason as to high cholesterol on February 3, 2015. Tr. at 336. Dr. Mason explained that Plaintiff's cholesterol was good, but his triglycerides were over 100 points higher than the recommended range. Tr. at 337. Plaintiff reported exercising and following a low fat diet, but was unsure of how much fiber he was consuming. *Id.* He said he rarely took Tramadol. *Id.* Dr. Mason recorded normal findings on exam, including normal ambulation, normal muscle strength and tone, normal movement of all extremities, no edema, and normal gait and station. Tr. at 337–38. She instructed Plaintiff to exercise and add fiber to his diet and to continue Simvastatin 20 mg. Tr. at 338.

Plaintiff followed up with Dr. Mason to review lab studies and obtain medication refills on August 4, 2015. Tr. at 332. He endorsed chronic lower back pain. Tr. at 333. He reported following a low fat, high fiber diet and staying active through biking. *Id.* Dr. Mason recorded normal findings on exam, including normal motor strength and tone, no extremity edema, normal gait and station, normal curvature of the thoracolumbar spine, and normal ambulation. Tr. at 334. She noted high triglycerides and low high-density lipoprotein ("HDL") cholesterol. *Id.* She recommended exercise and a high fiber, low fat diet to address Plaintiff's elevated body mass index

("BMI"). Tr. at 335. She refilled Bisoprolol-Hydrochlorothiazide 2.5-6.25 mg, Simvastatin 20 mg, and Tramadol 50 mg. *Id.*

Plaintiff presented to Saria Almo, PA ("PA Almo"), for a cyst on his back on August 31, 2015. Tr. at 330. He indicated the cyst had been present for years, but had become very tender and hot over the prior three days. Tr. at 331. PA Almo noted the presence of a large, warm, fluctuant cyst on Plaintiff's back. *Id.* She prescribed Doxycycline Hyclate 100 mg. *Id.*

On September 8, 2015, Plaintiff reported continued pain related to the cyst and a low-grade fever that had lasted two to three days. Tr. at 327. He indicated he had stopped Doxycycline because of stomach upset and was taking Bactrim. *Id.* PA Almo observed a large abscess in Plaintiff's mid-back that was extremely tender and had yellow drainage. Tr. at 329. She assessed cellulitis and abscess and referred Plaintiff to Dr. Moore, a general surgeon. *Id.*

Plaintiff presented to PA Almo for wound evaluation on September 11, 2015. Tr. at 326. PA Almo noted mild edema and "yellowish" discharge from the wound. *Id.* She irrigated and packed it. *Id.*

Plaintiff presented to PA Almo for a wound check on September 14, 2015. Tr. at 322. PA Almo noted "yellowish" drainage. Tr. at 324. She irrigated and packed the wound and instructed Plaintiff to follow up in three days. *Id.*

Plaintiff follow up with PA Almo for a wound check on September 16, 2015. Tr. at 321. PA Almo noted the wound had mild erythema, but was healing. Tr. at 322. She irrigated and packed the wound and instructed Plaintiff to follow up in three days. *Id.*

Plaintiff followed up with PA Almo on September 18, 2015. Tr. at 319. PA Almo noted the incision on Plaintiff's back was clear without discharge, but still had some surrounding induration. *Id.* She indicated Plaintiff should not continue packing the wound and should follow up with the surgeon. *Id.*

Plaintiff presented to orthopedic surgeon James O. Merritt, IV, M.D. ("Dr. Merritt"), for evaluation of back pain on December 4, 2015. Tr. at 358. He described sharp, worsening back pain that was aggravated by movement/positioning, twisting, and flexing his back. *Id.* He denied numbness, tingling, and weakness. *Id.* Dr. Merritt observed Plaintiff to be "a little tender in the low back on the left side," but to have normal alignment of the spine, no hip pain with motion, and no deficits in his lower extremities. Tr. at 359. He recommended PT and indicated that he would order a new MRI if Plaintiff did not improve with PT. *Id.*

Plaintiff presented to Dr. Mason to discuss MRI results and for completion of disability forms on December 10, 2015. Tr. at 316. He reported back issues that were precipitated by working as a truck driver. *Id.* He described intermittent left lower back pain that radiated down his left leg. *Id.*

He stated his pain presented approximately three times a week and was provoked by prolonged sitting and standing. *Id.* He said he was able to sit for one to two minutes and stand for 10 to 15 minutes prior to developing pain. *Id.* He stated he had recently seen Dr. Merritt, who had instructed him to lift no more than 20 pounds. *Id.* Dr. Mason observed the following: normal ambulation; normal motor strength and tone; no edema; normal gait and station; normal curvature of the thoracolumbar spine; and left paraspinal lumbar tenderness. Tr. at 317. She assessed degeneration of lumbar intervertebral disc with occasional radicular pain and intermittent low back pain. *Id.*

Plaintiff presented to Select Physical Therapy for an initial evaluation on January 4, 2016. Tr. at 363. He reported walking for up to an hour for exercise with pain he rated as a seven at the end of the walk, golfing two to three times per week, and performing yardwork with pain. *Id.* He described pain in his central low back that radiated to his left low back and occasionally to his left buttock. *Id.* He endorsed the ability to stand for 30 to 60 minutes with pain and noted that firmer chairs aggravated his pain upon sitting. *Id.* Physical Therapist Colleen Volpe ("PT Volpe"), noted active extension to 10 degrees, active flexion to 40 degrees, and bilateral side bending to 10 degrees. *Id.* She recorded normal patellar and Achilles reflexes and negative SLR

bilaterally. *Id.* She recommended Plaintiff attend three sessions per week for four weeks. Tr. at 365.

Plaintiff followed up for PT sessions on January 11, 13, 15, 18, 20, 22, 25, and 27, 2016. Tr. at 390–408.

Plaintiff presented to Dr. Mason to have disability forms completed on January 19, 2016. Tr. at 643. He described his pain as a constant ache that varied from a two to an eight and was exacerbated by standing and driving for extended periods. *Id.* Dr. Mason observed normal ambulation, normal motor strength, normal tone, no edema, normal gait and station, normal curvature of the spine, and left paraspinal lumbar and sacroiliac tenderness. *Id.*

Dr. Mason completed a questionnaire labeled "PHYSICAL FUNCTIONAL CAPACITY ASSESSMENT" the same day. Tr. at 350–56. She reported having treated Plaintiff every six months between November 4, 2014, and January 19, 2016. Tr. at 350. She indicated she had diagnosed Plaintiff with lumbar disc disease with intermittent radicular pain. *Id.* She stated the diagnosis was supported by findings of tenderness in the lumbar spine and left thereof. *Id.* She noted Plaintiff experienced constant, aching pain to the left of his lumbar spine that was worsened by standing and driving. *Id.* She stated Plaintiff's pain varied from a two to an eight. Tr. at 351. She noted clinical signs that included tenderness to palpation and

osteophytes and disc disease on MRI. *Id.* She indicated Plaintiff used Tramadol 50 mg that caused drowsiness. *Id.* She confirmed that Plaintiff's impairment had lasted or was expected to last for 12 months or more, that his impairment was reasonably consistent with his symptoms and the functional limitations described, and that the limitations applied as early as May 2011. Tr. at 352. She considered Plaintiff capable of high stress work. Tr. at 353. She estimated Plaintiff could walk a mile without rest and could sit, stand, and walk for 0 to 30 minutes each before changing positions. *Id.* She stated Plaintiff could sit and stand/walk for greater than six hours total in an eight-hour workday, assuming normal breaks every two hours. *Id.* However, she felt that Plaintiff would likely require one to two unscheduled breaks for 20 to 30 minutes during an eight-hour workday. *Id.* She denied that Plaintiff would require a cane or other assistive device to stand and walk. Tr. at 354. She indicated Plaintiff could frequently lift zero to 10 pounds, could occasionally lift 11 to 20 pounds, and could rarely or never lift 21 pounds or more "[p]er ortho surgeon." *Id.* She noted Plaintiff's impairments were likely to produce "good" and "bad" days and would likely cause him to be absent from work about twice a month. Tr. at 355.

James D. St. Cyr, PT ("PT St. Cyr"), performed a PT reevaluation on January 27, 2016. Tr. at 373. Plaintiff reported his pain was a five after walking for an hour. *Id.* PT St. Cyr noted minimal change in the length of

ambulation time, but noted Plaintiff's symptoms occurred less frequently throughout the hour. *Id.* Plaintiff's active extension had increased from 10 to 15 degrees. *Id.* PT St. Cyr wrote the following:

> [Plaintiff] has made good improvements in pain level and myofascial restriction during ADLs and standing trunk ROM, but continues to note difficulty amb[ulating greater] than 60 minutes. Good response to manual traction and he would benefit from continuing skilled PT to further progress flexion/stabilization program and continuing with mechanical traction to further alleviate symptoms.

*Id.* He recommended Plaintiff participate in two PT sessions per week for four weeks. Tr. at 375.

Plaintiff attended additional PT sessions on February 1, 4, and 8. Tr. at 409–16. On February 8, 2016, he reported pain after standing for too long during a Super Bowl party. Tr. at 414. Seonead Milburn, PTA, noted Plaintiff had increased restrictions to his left quadrilateral and gluteal muscles that improved with soft tissue mobilization. Tr. at 415. She noted Plaintiff had no pain with exercises, did well with treatment, and had decreased pain after treatment. *Id.*

Plaintiff reported doing well on July 11, 2016. Tr. at 640. He reported occasional back discomfort for which he took Tramadol as needed and indicated he had three or four tablets remaining from a 30-pill prescription he filled in August 2015. *Id.* Dr. Mason observed no edema and noted normal

ambulation, motor strength, tone, gait, station, and thoracolumbar curvature. Tr. at 640. She refilled Plaintiff's medications. Tr. at 641.

On August 4, 2017, Plaintiff reported taking Tramadol as needed, but noted it no longer helped to relieve his back pain. Tr. at 636. Dr. Mason noted that Plaintiff had seen Dr. Walker in June and received 18 Hydrocodone. *Id.* Plaintiff described back pain that interfered with sleep and intermittently radiated down his legs. Tr. at 637. He indicated he had been diagnosed with bronchitis a month prior and continued to have some wheezing. *Id.* Dr. Mason recorded normal findings on exam, except for a notation that Plaintiff was overweight. Tr. at 638. She prescribed 30 Hydrocodone-Acetaminophen 5-325 mg tablets and instructed Plaintiff to take them as needed for severe back pain. *Id.*

Plaintiff reported no complaints on February 14, 2018. Tr. at 633. He described chronic back pain that did not occur daily and was managed by Hydrocodone. Tr. at 634. He reported playing golf two to three times per week and walking for exercise. *Id.* Dr. Mason noted normal findings, aside from obesity. Tr. at 635. She encouraged diet and exercise to reduce Plaintiff's BMI. *Id.*

On August 17, 2018, Plaintiff reported doing well, watching his diet, and walking for exercise. Tr. at 631. He noted his blood pressure had dropped by 15 points, but denied dizziness or other problems with his blood pressure

medication. Tr. at 632. He indicated he only needed Hydrocodone "when his back [was] in pain," which occurred only occasionally. *Id.* Dr. Mason noted normal findings on exam. *Id.* She refilled Simvastatin and Bisoprolol-Hydrochlorothiazide and instructed Plaintiff to call when he required a refill of Hydrocodone. *Id.*

Plaintiff underwent a second MRI of the lumbar spine on November 1, 2018, that showed trace anterolisthesis of L4 on L5 with associated facet arthropathy and mild spinal canal stenosis. Tr. at 645. It also indicated mild-to-moderate right and no significant left neural foraminal stenosis at L4–5. *Id.*

Plaintiff presented to orthopedist Thomas Scott Ellison, M.D. ("Dr. Ellison"), for evaluation of back pain on January 29, 2019. Tr. at 662. He described left lumbar pain that occurred intermittently, occasionally radiated to his left thigh, and was a four in severity. *Id.* Dr. Ellison noted normal findings on exam, aside from reproducible tenderness on palpation of the left lumbosacral junction. Tr. at 662–63. He assessed back pain with left-sided sciatica, degenerative lumbar spinal stenosis, spondylolisthesis of the lumbar region, and DDD. Tr. at 663. He stated the MRI of Plaintiff's lumbar spine was of poor quality and recommended a non-open MRI with possible sedation due to claustrophobia if he did not improve within six weeks. *Id.* He also recommended PT and pain management. *Id.* Plaintiff informed Dr. Ellison

that he desired to proceed with pain management because he had previously participated in PT and performed home exercises without relief. *Id.*

Plaintiff presented to Dr. Mason on January 29, 2019, after his blood pressure was elevated at 150/90 mmHg during his visit with Dr. Ellison. Tr. at 628. His blood pressure was 134/88 mmHg upon check in Dr. Mason's office. *Id.* Dr. Mason instructed Plaintiff to find his home blood pressure cuff and to monitor and report his pressures. *Id.*

Plaintiff presented to Catherine Smith Gallier, M.D. ("Dr. Gallier"), for a pain consultation on February 12, 2019. Tr. at 675. He reported intermittent, aching pain in the left lower lumbar and buttock region that ranged from a zero to an eight. *Id.* He endorsed a seven-year history of similar pain, but indicated it was occurring more frequently. *Id.* Dr. Gallier observed diffuse tenderness in the left lower lumbar area around the L4–5 banding, tenderness in the facet loading region, and flexion and extension limitations. Tr. at 676. She recommended diet, light core strengthening and ROM exercises, and L3 to S1 facet injections. Tr. at 677.

Plaintiff presented to Dr. Mason for a physical and to discuss his chronic conditions on February 18, 2019. Tr. at 627. He reported feeling good in general, but noted the orthopedist had recommended pain management treatment for arthritis and stenosis and he was waiting for insurance approval. *Id.* He indicated he continued to walk daily and to play golf. *Id.* He

stated he had used the seven Hydrocodone Dr. Mason had prescribed the prior August. *Id.* Dr. Mason noted normal ambulation, motor strength, tone, movement of all extremities, gait, station, and thoracolumbar curvature. *Id.* She encouraged diet and exercise to maintain blood pressure, lower BMI, and decrease Plaintiff's cardiovascular risk factors. *Id.* She refilled the prescription for seven Hydrocodone-Acetaminophen 5-325 mg to be used as needed for severe pain. *Id.*

Channing D. Willoughby, M.D. ("Dr. Willoughby"), performed left L3–4, L4–5, and L5–S1 lumbar facet joint blocks under fluoroscopy on March 13, 2019. Tr. at 673–74. He administered left L3–4, L4–5, and L5–S1 lumbar facet joint blocks under fluoroscopy on March 22, 2019. Tr. at 671–72.

On April 29, 2019, Dr. Willoughby performed left L2, L3, and L4 lumbar medial branch nerve rhizotomy and left L5 dorsal ramus nerve rhizotomy under fluoroscopy. Tr. at 669–70. Plaintiff tolerated the procedures well. Tr. at 670.

Plaintiff reported 100% relief from rhizotomy on May 29, 2019. Tr. at 666. He said he only experienced mild aching pain and had been able to increase his activities and return to playing golf. *Id.* Dr. Willoughby recorded normal findings on exam, aside from slow and cautious gait. Tr. at 666–67. Plaintiff agreed to continue with light PT exercises and daily walking and stretching and to follow up with Dr. Willoughby as needed. Tr. at 667.

On June 6, 2019, Plaintiff reported he had recently visited the ER after having experienced dizziness and impaired balance. Tr. at 624. He indicated the provider suspected he was dehydrated, as he had been working outside prior to developing symptoms. *Id.* Plaintiff continued to report some headaches and neck pain. *Id.* Dr. Mason observed Plaintiff to have normal ambulation, motor strength, tone, movement of all extremities, gait, station, and thoracolumbar curvature. *Id.* She assessed vertigo and refilled Plaintiff's prescriptions for Bisoprolol-Hydrochlorothiazide and Simvastatin. Tr. at 624–25.

Plaintiff followed up with Dr. Mason as to chronic medical problems on August 19, 2019. Tr. at 621. He reported having presented to the ER with suspected chest pain several weeks prior, but indicated a nuclear stress test was normal and gas bubbles in his chest were likely the source of his pain. *Id.* He complained of right calf cramps, and Dr. Mason recommended he monitor his potassium, magnesium, and salt intake. *Id.* Plaintiff reported walking for 20 minutes at a time a few times a week and playing golf. *Id.* Dr. Mason noted normal ambulation, motor strength, tone, movement of all extremities, gait, station, and thoracolumbar curvature. Tr. at 622. She continued Plaintiff's medications and instructed him to obtain lab studies prior to a six-month follow up visit. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    February 10, 2016

Plaintiff testified that he had worked for a municipality as a garbage truck driver for 34 years. Tr. at 37. He stated he primarily drove the truck, but would get out to assist the other workers with refrigerators, stoves, and other bulky items. Tr. at 38. He said he stopped working in April 2012 because he was experiencing pain in his lower left lumbar spine. Tr. at 38–39. He indicated his back pain prevented him from straightening up and lifting and caused pain when he was driving for work. Tr. at 39. He stated his doctor had taken him out work and had referred him for an MRI. *Id.*

Plaintiff stated he had participated in several rounds of PT and had taken pain medications. *Id.* He testified that he could stand comfortably for 15 to 30 minutes prior to experiencing increased pain in his left lower lumbar area. Tr. at 39–40. He said he could walk for an hour, but would need to sit down after doing so because of pain. Tr. at 40. He stated he could perform household chores for about 30 minutes at a time and denied being able to engage in any activity for two hours without stopping. *Id.* He estimated that he could drive for two hours at a time. Tr. at 41. He said he could likely drive again after taking a break, but denied being able to drive in two-hour

increments with breaks between to complete an eight-hour workday. *Id.* He stated he could likely lift a maximum of 20 pounds. Tr. at 42.

Plaintiff testified that his back pain caused sleep disturbance. Tr. at 40. He said he slept well with pain medication, but awoke during the night if he did not take it. Tr. at 40–41. He indicated he was unable to drive when taking his pain medication because of drowsiness. Tr. at 41. He said he experienced pain every day. Tr. at 42. He stated he typically napped during the day. *Id.*

ii.      December 3, 2019

At the second hearing, Plaintiff testified that he last worked in April 2012 and that any subsequent earnings represented paid sick leave. Tr. at 442. He said that his job as a garbage truck driver required that he assist the workers on the back of the truck "[a]t big stops" at least ten times during a day. Tr. at 442–43. He stated he would lift items that weighed 50 pounds or more. Tr. at 443.

Plaintiff testified that he had developed back pain over time. Tr. at 444. He denied having filed a workers' compensation claim. *Id.* He stated that prior to having left his job, he had awakened one morning and been unable to get out of bed because of back pain. Tr. at 445. He said he had to climb seven or eight feet to get into the cab of the garbage truck and was having difficulty doing so. *Id.*

Plaintiff stated his back pain had not decreased since he stopped working. Tr. at 446. He indicated he had initiated pain management treatment in March or April 2019 and had received three injections that had provided some relief. *Id.*

Plaintiff testified that he did not believe that he would have been able to return to his PRW at any time because of the lifting requirements and "bouncing in the truck" that would cause him to hit his body on the seat and his head on the ceiling. Tr. at 446–47. He stated he continued to have difficulty standing on hard surfaces and could only do so for 15 to 30 minutes at a time. Tr. at 447.

Plaintiff admitted that he continued to play golf twice a week. Tr. at 447–48. He said he used a cart and usually had someone else lift his clubs. Tr. at 448. He stated he sometimes had to remove his golf clubs from his car, but claimed they did not weigh more than 20 pounds. *Id.* He indicated a round of golf usually took him three-and-a-half to four hours and he did no other activities on days that he played golf. Tr. at 449.

Plaintiff testified he helped his wife with household chores and performed yardwork for an hour to an hour-and-a-half at a time. Tr. at 448–49. He said he used a self-propelled mower to mow his lawn. Tr. at 449. He indicated he also cooked, cleaned, and vacuumed. Tr. at 450. He said he could

drive for two hours at a time and for six hours with breaks every two hours. *Id.* He stated he would drive to New York over the course of two days. *Id.*

           b.     Vocational Expert Testimony

           i.     February 10, 2016

Vocational Expert ("VE") Mary Cornelius reviewed the record and testified at the hearing. Tr. at 42–45. The VE categorized Plaintiff's PRW as a garbage collector driver, *Dictionary of Occupational Titles* ("*DOT*") number 905.663-010, as requiring medium exertion with a specific vocational preparation ("SVP") of 3. Tr. at 43. The ALJ asked if any skills acquired in Plaintiff's PRW transferred to the light or sedentary exertional levels. *Id.* The VE testified that they did not. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform medium work requiring no climbing of ladders, ropes, or scaffolds and no work at unprotected heights. *Id.* The VE testified the hypothetical individual would be able to perform Plaintiff's PRW. *Id.* The ALJ asked the VE to further consider that the individual would be limited to only occasional climbing of ramps and stairs. *Id.* He asked if the individual would still be able to perform Plaintiff's PRW. Tr. at 43–44. The VE stated the additional restriction would have no impact on the individual's ability to perform Plaintiff's PRW. Tr. at 44.

Plaintiff's attorney asked the VE to consider an individual who was limited to medium work and would miss at least two days of work per month. *Id.* She asked if the additional restriction would preclude Plaintiff's PRW or other jobs. *Id.* The VE testified that the additional restriction would preclude all competitive employment. *Id.* Plaintiff's attorney asked for clarification as to the climbing requirements of his PRW, given the need to climb in and out of the cab of the garbage truck. *Id.* The VE explained that the garbage truck driver did not typically get out of the truck to assist, but stated that when he did, there was generally no climbing. Tr. at 44–45.

### ii.    December 3, 2019

VE Kristine Handley reviewed the record and testified at the second hearing. Tr. at 452–55. The VE categorized Plaintiff's PRW as a garbage collector driver, *DOT* number 905.663-010, as being performed at the medium exertional level and having an SVP of 3. Tr. at 452. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform medium work with no climbing of ladders, ropes, or scaffolds and should avoid work at unprotected heights. *Id.* He asked if the hypothetical individual could perform Plaintiff's PRW. *Id.* The VE responded in the affirmative. Tr. at 452–53. The ALJ asked if Plaintiff had any acquired job skills that would transfer to light or sedentary work. Tr. at 453. The VE stated he had none. Tr. at 453. The ALJ asked if there were other jobs the individual could

perform. *Id.* The VE identified jobs requiring medium exertion with an SVP

of 2 as a laundry worker, I, *DOT* number 361.684-014, a hand packer, *DOT*

number 920.587-018, and a dining room attendant, *DOT* number 311.677-

018, with 33,000, 165,000, and 296,000 positions in the national economy,

respectively. *Id.*

Plaintiff's attorney asked the VE why the restriction as to climbing of

ladders, ropes, and scaffolds would not preclude Plaintiff's PRW. *Id.* The VE

stated she had equated the climbing required to climbing of stairs. Tr. at 454.

The ALJ sought clarification from Plaintiff as to the number of steps he had

to climb, and Plaintiff indicated he thought it was three steps. Tr. at 455. The

VE stated that three steps would not equate to a ladder. *Id.*

### 2.    The ALJ's Findings

In his decision dated February 10, 2020, the ALJ made the following

findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2018.

2.    The claimant did not engage in substantial gainful activity during the period from his amended alleged onset date of January 5, 2013 through his date last insured of December 31, 2018 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairment: degenerative disc disease (DDD) (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform less than the full range of medium work[3] as defined in 20 CFR 404.1567(c) except he cannot climb ladders, ropes, or scaffolds. The claimant must avoid working at unprotected heights.

6.  Through the date last insured, the claimant was capable of performing past relevant work as a garbage collections driver. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant was not under a disability, as defined in the Social Security Act, at any time from January 5, 2013, the amended alleged onset date, through December 31, 2018, the date last insured (20 CFR 404.1520(f)).

Tr. at 423–30.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ failed to adequately support the RFC for medium work;

2)  the ALJ provided insufficient reasons for giving little weight to Plaintiff's treating physicians' opinions;

3)  the ALJ did not properly assess Plaintiff's subjective allegations;

4)  the ALJ erred in concluding that Plaintiff could perform his PRW; and

5)  the case should be remanded for an award of benefits.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

---

[3] The ALJ included the following footnote: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds, as well as sitting, standing, or walking for 6 hours each in an 8-hour workday." Tr. at 425 n.2.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4)

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d

287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    RFC for Medium Work

Plaintiff argues the ALJ failed to build a logical bridge between the evidence and the conclusion that he could meet the demands of medium

work. [ECF No. 15 at 15–21]. He maintains the record contains no medical opinions that support an RFC for medium work. *Id.* at 17–18. He points out that, in remanding the case, the Appeals Council noted that state agency medical consultants did not review the record and that the ALJ should not consider or address the RFC assessment of "a single decisionmaker," but that the ALJ ignored the Appeals Council's direction. *Id.* He contends the ALJ erroneously focused on whether he was incapable of all work, ignored relevant evidence in concluding that he had the RFC to perform medium work, and substituted his interpretation of the medical evidence for the interpretations of medical providers. *Id.* at 19–20.

The Commissioner argues the ALJ never mentioned the single decisionmaker or his findings in weighing the evidence. [ECF No. 17 at 16]. He maintains the reference in the ALJ's decision to "program physicians" was "clearly an inadvertent typographical error and in no way affected the outcome of this case," as no program physicians reviewed the case. *Id.* at 17. He contends the ALJ did not err in declining to base the RFC assessment on a medical opinion because the RFC assessment is to be based on "all of the relevant medical and other evidence." *Id.* at 18.

A claimant's RFC represents "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ should consider all the relevant evidence and account for all the claimant's medically-determinable

impairments. 20 C.F.R. § 404.1545(a)(1), (2). He must include a narrative discussion that cites "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explains how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7. He must also explain how any material inconsistencies or ambiguities in the record were resolved." SSR 16-3p, 2016 WL 1119029, at *7. "A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013).

The ALJ must "consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect [the claimant's] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)). Although in *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), the court declined to adopt a per se rule requiring remand where an ALJ fails to engage in a function-by-function analysis, it did so because "remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Nevertheless, the court stated that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's

capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The court has provided further guidance as to its expectations for RFC assessments. In *Thomas*, 915 F.3d at 311, it explained that "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." In *Dowling v. Commissioner of Social Security Administration*, 986 F.3d 377, 387 (4th Cir. 2021), the court emphasized the requirement that the ALJ explicitly follow the regulatory framework in 20 C.F.R. § 404.1545 and § 416.945 and SSR 96-8p and engage in a function-by-function analysis as to relevant functions in assessing a claimant's RFC. After noting the ALJ's failure to follow the correct regulatory framework, the court wrote:

> Instead, the ALJ's RFC determination was based entirely on SSRs 96-7p and 16-3p, which set out the process ALJs use to "evaluate the intensity and persistence of [a claimant's] symptoms" and determine "the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the record." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). Of course, a claimant's symptoms, and the extent to which the alleged severity of those symptoms is supported by the record, is relevant to the RFC evaluation. *See* 20 C.F.R. § 416.945(a)(3) (stating that when evaluating an RFC, an ALJ should consider "limitations that result from the claimant's symptoms, such as pain"). But an RFC assessment is a separate and distinct inquiry from a symptom evaluation, and the ALJ erred by treating them as one and the same.

Here, the ALJ engaged in the same flawed analysis. His only reference to 20 C.F.R. § 404.1545 and SSR 96-8p appears in the boilerplate explanation of the disability evaluation process. *See* Tr. at 423. Instead of addressing the proper regulatory framework, he immediately addressed Plaintiff's subjective allegations, concluding they were inconsistent with the other evidence of record. Tr. at 426, 427.

The ALJ further noted he had "considered the limiting effects of obesity in assessing the claimant's residual functional capacity" in accordance with SSR 19-2p, but determined that "the evidence d[id] not support a conclusion that obesity, either alone or in combination with other impairments, preclude[d] claimant from performing work within the assigned residual functional capacity." Tr. at 427–28.

The ALJ wrote that he had "considered the findings of fact made by medical consultants and other program physicians regarding the nature and severity of the claimant's impairments." Tr. at 428. Plaintiff argues that the ALJ's statement suggested that he had considered evidence in contravention of the Appeals Council's instruction. [ECF No. 15 at 17–18]. Pertinent to Plaintiff's argument, the record contains an initial decision from a single decisionmaker who found that Plaintiff had the RFC to perform medium work. *See* Tr. at 52–53. The ALJ's reliance on the single decisionmaker's opinion was a reason that the Commissioner consented to the prior remand.

The Appeals Council's order remanding the case to the ALJ stated the following:

> The hearing decision does not contain an adequate evaluation of the opinion evidence of record. The Administrative Law Judge found that the claimant retains the residual functional capacity for work-related functions that equates to a maximum sustained capability for medium work with: no climbing of ladders, ropes, or scaffolds; and avoidance of work at unprotected heights (Decision, page 5). In support, the Administrative Law Judge gave considerable weight to the opinions of the State agency medical consultants, who indicated the claimant was capable of a range of medium work (Decision, page 9; Exhibit 2A)). However, State agency medical consultants did not review the file and instead the residual functional capacity was determined by a single decisionmaker (Exhibit 2A). Findings and conclusions reached by single decisionmakers are not medical opinion evidence because they do not come from medically acceptable sources. Consequently, such findings should not be considered or addressed in the hearing decision.

Tr. at 489. Although the ALJ wrote that he had "considered the findings of fact made by . . . other program physicians regarding the nature and severity of the claimant's impairments," he only discussed Dr. Jenouri's observations and opinion, giving "significant weight" to the opinion that Plaintiff had no restrictions, "as it [was] consistent with the other evidence of record, as well as consistent with the claimant's ability to participate in a vast array of activities." *See* Tr. at 428. He did not address the single decisionmaker's indication that Plaintiff could perform medium work. In the absence of any more evidence, the undersigned is disinclined to find that the ALJ ignored the Appeals Council's instruction.

Nevertheless, the ALJ's further discussion of the RFC assessment yields no rationale to support his assessment of an RFC for medium work. In *Dowling*, 986 F.3d at 388, the court stated the ALJ erred in assessing the claimant's RFC "in terms of [] exertional levels of work" without first engaging in "a function-by-function analysis." *Id.* (citing *Monroe*, 826 F.3d at 179; *Thomas* 916 F.3d at 311, 312). In accordance with 20 C.F.R. § 404.1545(b), the ALJ was required to assess Plaintiff's abilities to sit, stand, walk, lift, carry, push, pull, and perform other physical functions prior to concluding that he could perform medium work. He did not do so.

Nowhere in his decision does the ALJ explain how the evidence supports a finding that Plaintiff could meet the lifting and carrying requirements of medium work. This is particularly bothersome as the ALJ cited specific evidence to support a 20-pound lifting restriction, referencing Plaintiff's report that "he trie[d] not to lift anything heavier than 20 pounds," Tr. at 426, and Dr. Mason's indications that he could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds, Tr. at 427. The ALJ gave "little weight to Dr. Mason's opinion," considering it "inconsistent with the medical evidence discussed above, and her treatment notes, which are unremarkable that very day (Exhibit 6F, 9F/25)." Tr. at 427. However, he cited no evidence that suggested Plaintiff was able to lift 50 pounds frequently and 25 pounds occasionally to perform medium work, as

37

opposed to 20 pounds occasionally and 10 pounds frequent to perform light work.

The ALJ concluded discussion of Plaintiff's RFC as follows:

In sum, the above residual functional capacity assessment is supported by the weight of the evidence of record. Notably, physical therapy notes from January and February 2016 indicate that the claimant walked one hour regularly, golfed 2–3 times a week, and did yard work (Exhibit 8F). Nevertheless, because of his DDD, the claimant has required some treatment and experienced some limitations. Therefore, the undersigned has limited the claimant to medium work activity except he cannot climb ladders, ropes, or scaffolds; and he must avoid working at unprotected heights. These restrictions take into account physical limitations associated with his degenerative disc disease of the lumbar spine and his body habitus. However, a finding that the claimant was incapable of all work activity, prior to his date last insured, is not supported by the evidence of record as a whole, for the reasons explained above.

Tr. at 428.

Given Plaintiff's age, education, and PRW, the relevant inquiry was not whether he "was incapable of all work activity" prior to his date last insured. Instead, Plaintiff's eligibility for benefits turned on whether he was incapable of performing medium work. In the absence of further explanation, none of the examples the ALJ gave of Plaintiff's ADLs clearly indicated he could meet the lifting requirements of medium work. Because the ALJ has failed to resolve conflicting evidence or to cite any direct evidence that would support a finding that Plaintiff could meet the lifting requirements of medium work, his RFC assessment is not supported by substantial evidence.

2.    Treating Physicians' Opinions

The record contains opinions from two of Plaintiff's treating physicians and the consultative examiner. On June 25, 2012, Dr. Levin noted Plaintiff would "continue to remain out of work as the vibrations of the truck and the lifting and carrying activities that he ha[d] to do w[ould] likely not be very well tolerated." Tr. at 254. On March 3, 2014, Dr. Jenouri assessed Plaintiff as having no restrictions based on his findings during the consultative exam. Tr. at 281. On January 19, 2016, Dr. Mason opined that Plaintiff's lumbar disc disease with intermittent radicular pain would permit him to sit, stand, and walk each for 30 minutes at a time and for a combined total of greater than six hours in an eight-hour workday; necessitate one or two unscheduled breaks for 20 to 30 minutes during an eight-hour workday; allow him to lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; and cause him to be absent from work about twice a month. Tr. at 350–56.

Plaintiff argues that substantial evidence does not support the ALJ's allocation of "little weight" to Dr. Mason's opinion. [ECF No. 15 at 21–26]. He maintains the ALJ did not cite specific evidence that was contrary to Dr. Mason's opinion. *Id.* at 23. He claims that Dr. Mason's treatment notes, including the records from the date that she provided the opinion, support her conclusions. *Id.* at 23–24. He contends Dr. Mason's opinion is also supported by other evidence, including the MRI results, Dr. Levin's opinion,

Dr. Merritt's assessment, and Dr. Ellison's treatment records. *Id.* at 24–26. He notes the ALJ failed to address Dr. Levin's opinion that he could not perform his PRW. *Id.* at 32.

The Commissioner argues that substantial evidence supports the ALJ's consideration of the medical source evidence. [ECF No. 17 at 16–24]. He maintains the ALJ accorded significant weight to Dr. Jenouri's opinion that Plaintiff had no functional limitations because "[i]t was consistent with other evidence of record and with [Plaintiff's] ability to participate in a vast array of activities." *Id.* at 19. He contends the ALJ gave little weight to Dr. Mason's opinion because it was inconsistent with the medical evidence and her treatment notes, including those from the same day that she rendered the opinion. *Id.* at 20–23. He claims Dr. Levin did not opine that Plaintiff could not perform his PRW, but instead concluded that his symptoms "d[id] not warrant pain management" and that he "w[ould] likely not tolerate well the activities of his job." *Id.* at 27.

Because Plaintiff's application for benefits was filed prior to March 27, 2017, the rules and regulations in 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, and 06-3p set forth the relevant factors the ALJ was to consider in evaluating the medical opinions of record. *See* 20 C.F.R. § 404.1520c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 apply); 82 Fed. Reg. 15,263 (stating the rescissions of SSR 96-2p, 96-5p, and 06-3p were

effective for "claims filed on or after March 27, 2017"). Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." SSR 96-5p (quoting 20 C.F.R. § 404.1527(a)(2). ALJs are required to "evaluate every medical opinion [they] receive." 20 C.F.R. § 404.1527(c).

Pursuant to the treating physician rule, if a treating physician's medical opinion is well supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record, the ALJ is required to accord it controlling weight. 20 C.F.R. § 404.1527(c)(2). "[T]reating physicians are given 'more weight . . . since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone[.]" *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).

"[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v.*

*Apfel*, 270 F.3d 174 (4th Cir. 2011) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). However, if the ALJ finds a treating physician's opinion is not well supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence of record, he cannot merely reject the opinion. SSR 96-2p, 1996 WL 374188, at *4. His decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record" and must be "sufficiently specific to make clear" to the court "the weight [he] gave to the . . . opinion and the reason for that weight." *Id.* at *5. If the ALJ declines to accord controlling weight to the treating source's medical opinion, he must weigh all the medical opinions of record based on the factors in 20 C.F.R. § 404.1527(c), which include: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527(c)).

The ALJ's decision contains no reference to Dr. Levin's opinion. Although the opinion was rendered prior to Plaintiff's alleged onset date, it was relevant to evaluation of his ability to perform his PRW and other jobs requiring similar physical demands. Plaintiff's testimony reflects that he last

worked as a garbage truck driver for the Town of Cortlandt in April 2012, prior to Dr. Levin's rendering of the opinion. Tr. at 37, 442. The ALJ acknowledged that Plaintiff's subsequent earnings in 2012 and 2013 were for "paid leave until he was approved for retirement benefits through the State of New York on January 26, 2013." Tr. at 424. The record further indicates that the onset date was amended to coincide with Plaintiff's 55th birthday based on the expectation that Grid Rule 202.06 would direct a finding that he was disabled. Tr. at 440–41, 617, 618. Thus, Plaintiff alleged no change in his functional abilities between the time that Dr. Levin rendered the opinion and his alleged onset date. Because 20 C.F.R. § 404.1527(c) requires that ALJs weigh all medical opinions of record, the ALJ erred in failing to evaluate Dr. Levin's opinion.

The ALJ gave "little weight" to Dr. Mason's opinion, finding it "inconsistent with the medical evidence . . . and her treatment notes, which [were] unremarkable that very day (Exhibit 6F, 9F/25)." Tr. at 428. Prior to assessing Dr. Mason's opinion, the ALJ summarized the evidence. He referenced records from Hudson Valley Primary Care for the period from August 2013 to June 2014 in which Plaintiff denied leg swelling, joint pain, and weakness and examinations showed no acute distress or motor or sensory deficits. Tr. at 426. He discussed Dr. Jenouri's March 2014 observations, giving "significant weight" to his opinion that Plaintiff had no

restrictions. Tr. at 428. He noted Dr. Mason described Plaintiff as "being in no acute distress" and recorded an unremarkable exam, and Plaintiff denied back pain on November 4, 2014. Tr. at 426. He stated that Plaintiff reported feeling good and rarely taking Tramadol and had an unremarkable exam when he followed up with Dr. Mason in February 2015. *Id.* He remarked that Plaintiff reported a resolved muscle strain and denied muscle aches, arthralgia, and joint pain in August 2015. *Id.* He explained that Plaintiff denied weakness, numbness in his feet and legs, tingling, incontinence, and sleep disturbance when he presented to Dr. Merritt for evaluation of intermittent back pain in December 2015, and demonstrated tenderness on the left side of his low back, but normal alignment of the spine, no hip pain with motion, and no lower extremity deficits. Tr. at 426–27. He stated Dr. Merritt reviewed the 2012 MRI that showed moderate multilevel changes without acute structural abnormalities and recommended PT. Tr. at 427. He acknowledged that Plaintiff reported intermittent left lower back pain that radiated down his left leg and limited his sitting and standing abilities in December 2015, but that Dr. Mason noted only left paraspinal tenderness. *Id.* He recognized that Plaintiff made good improvements with his pain level during PT in January and February 2016, but continued to have difficulty ambulating greater than 60 minutes. *Id.* He noted that Plaintiff reported walking for exercise in August 2018 and had normal gait and an

unremarkable physical exam. *Id.* He stated a November 2018 MRI showed mild lower lumbar degenerative changes with no high-grade canal or foraminal stenosis. *Id.*

The ALJ cited sufficient evidence to support a decision not to accord controlling weight to Dr. Mason's opinion. Dr. Mason noted obesity and left paraspinal and sacroiliac tenderness on a couple of occasions, but generally recorded normal findings on exam. *See* Tr. at 317, 334, 337–38, 341, 622, 624, 627, 632, 635, 638, 640, 643. Drs. Levin, Merritt, Ellison, and Gallier similarly recorded few abnormalities on exam. *See* Tr. at 255, 359, 662–63, 676.

Nevertheless, the ALJ's evaluation of the relevant evidence is insufficient to support his allocation of little weight to it. The ALJ erred in evaluating the consistency of Dr. Mason's opinion with the other evidence to the extent that he neglected to reconcile evidence that was consistent with it. Like Dr. Mason, Drs. Levin, Merritt, Ellison, and Gallier noted tenderness in the same area of Plaintiff's spine. *See* Tr. at 255, 359, 662–63, 676. Although the ALJ acknowledged that PT records showed Plaintiff to have difficulty ambulating greater than 60 minutes, he did not consider the consistency of the record with Dr. Mason's indication that Plaintiff had reduced abilities to stand and walk. Tr. at 427. He also failed to acknowledge consistency between the restrictions Dr. Mason assessed and Dr. Levin's impression that

45

Plaintiff would be unable to continue to tolerate the lifting and carrying activities of his work as a garbage truck driver. Tr. at 254. Although the record contains few observations of abnormalities, the ALJ did not address evidence of reduced ROM of the lumbar spine upon testing[6] and positive SLR test on one occasion, which served as additional objective evidence supporting Dr. Mason's opinion. *See* Tr. at 261, 280–81, 363, 676. Finally, the ALJ failed to address the consistency of Dr. Mason's opinion with evidence that Plaintiff required stronger medication and greater intervention to address his pain over time, starting with a prescription for Tramadol, followed by physical therapy, subsequently receiving Hydrocodone-Acetaminophen, and undergoing lumbar facet joint blocks and rhizotomy following his date last insured. *See* Tr. at 636, 638, 669–70, 671–74.

In light of the foregoing, substantial evidence does not support the ALJ's evaluation of the medical opinions.

### 3.    Evaluation of Subjective Allegations

Plaintiff argues the ALJ failed to properly evaluate his subjective allegations. [ECF No. 15 at 26]. He maintains that his ADLs and PT records did not support a finding that he could perform medium work. *Id.* at 26–29. He claims the ALJ should have considered his 34-year work history in evaluating his subjective allegations. *Id.* at 29.

---

[6] The undersigned's review has yielded no results of ROM testing other than during Dr. Jenouri's exam and the physical therapy evaluation.

The Commissioner does not directly address Plaintiff's argument as to the ALJ's consideration of his subjective allegations. He maintains Plaintiff "participated in the 'not unusual' manner of using months of sick leave before retiring from his lifelong medium job at age 54" and "soon thereafter filed a claim for disability benefits and moved to South Carolina, where he golfs often, bikes, and does all his own yard work." [ECF No. 17 at 14]. He contends the ALJ correctly determined that the evidence and testimony supported his finding as to the RFC assessment and Plaintiff's ability to return to PRW. *Id.* at 14–15. He notes the ALJ pointed to "scant objective medical evidence" and noted that Plaintiff engaged in a variety of ADLs. *Id.* at 19 (referencing Tr. at 424).

In all cases, "an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis*, 858 F.3d at 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). The ALJ only advances to the second step if the claimant's impairments could reasonably produce the symptoms he alleges. *Id.* At the second step, the ALJ must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they

limit [his] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)).

The ALJ is required to explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2016 WL 1119029, at *8. The ALJ is not to evaluate a claimant's symptoms "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Lewis*, 858 F.3d at 866; *see also Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 98 (4th Cir. 2020) ("We also reiterate the longstanding law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.").

The ALJ found that Plaintiff's "medically determinable impairment could reasonably be expected to cause some of the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision." Tr. at 426. Because the ALJ found that Plaintiff's impairments could reasonably cause the symptoms he alleged, Plaintiff could rely exclusively on subjective evidence to prove the intensity, persistence, and limiting effect of

his symptoms. *See Arakas*, 983 F.3d at 98. However, the ALJ pointed to a combination of objective and subjective evidence that arguably suggested that Plaintiff's impairment was not as severe as he alleged. He referenced Plaintiff's statements, the treating and examining physicians' reports and opinions, Plaintiff's ADLs, and the objective evidence of record. *See* Tr. at 426–28.

> The ALJ wrote:
>
> The claimant's activities of daily living are inconsistent with his allegations of such significant functional limitations, but are fully consistent with the residual functional capacity described above. The evidence of record indicates that despite the claimant's complaints and allegations, he has admitted that he was able to bathe and dress himself, cook 5–7 times a week, clean twice a week, do laundry 3–4 times a week, shop, watch television, listen to the radio, read, go out to eat, play sports, golf, take care of his dogs, go for walks, do yard work, drive, and socialize with friends, activities which generally reveal functioning at a greater level than alleged (Exhibits 3E, 3F, 5F). Of note, his descriptions of his daily activities are representative of a fairly active lifestyle and are not indicative of a significant restriction of activities or constriction of interests.

*Id.*

As discussed above, at the heart of this case is whether Plaintiff's impairment prevented him from meeting the standing, walking, lifting, carrying, pushing, pulling, and other physical demands of his PRW and other medium work. Pursuant to SSR 16-3p, the ALJ must explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence

in [the] record." SSR 16-3p, 2016 WL 1119029, at *8. Despite this directive, the ALJ provided no such explanation.

Among the information an ALJ is to consider in evaluating the intensity, persistence, and limiting effect of an individual's symptoms are "[f]actors that precipitate and aggravate the symptoms." SSR 16-3p, 2017 WL 5180304, at *7–8. Plaintiff endorsed difficulty with lifting greater than 20 pounds and engaging in prolonged standing and walking. Tr. at 39, 40, 42, 186, 191, 316, 643. The court can assume that the ALJ rejected Plaintiff's allegations as to a 20-pound lifting ability and difficulty with prolonged standing and walking given his assessment of an RFC for medium work. However, he did not explain, and it is not clear without explanation, how the evidence he cited was inconsistent with Plaintiff's allegations.

From a lay perspective, it would seem that an individual capable of bathing and dressing himself, preparing meals five to seven times a week, cleaning twice a week, doing laundry three to four times a week, shopping, watching television, listening to the radio, reading, dining in restaurants, golfing multiple times a week, caring for pets, taking walks, engaging in yard work, driving, and socializing with friends would be able to perform some work. However, these activities do not unequivocally indicate that the individual could lift in excess of 20 pounds on a frequent basis, stand for six out of eight hours, or perform work as a trash collector driver, a laundry

worker, a hand packer, or a dining room attendant, as the ALJ concluded. *See* Tr. at 428–30. The ALJ is not examining the case from a lay perspective, and is required to evaluate the evidence based on regulations that provide an individual of Plaintiff's age and education who cannot perform his PRW is disabled even if he retains the ability to lift and carry 20 pounds occasionally and 10 pounds frequently and stand and walk for six hours in an eight-hour workday. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 202.06.

The appropriate inquiry is not whether a claimant can engage in an activity, but whether he can engage in that activity "in an ordinary work setting on a regular and continuing basis," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374814, at *2. The ALJ erroneously failed to consider the extent to which Plaintiff performed activities. *See Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) ("An ALJ may not consider the *type* of activities a claimant can perform without also consider the *extent* to which she can perform them.") (emphasis in original) (citing *Brown v. Commissioner*, 873 F.3d 251, 263 (4th Cir. 2017). The regulations acknowledge that "[a]n individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities . . . that aggravate his . . . symptoms." SSR 16-3p, 2017 WL 5180304, at *9. Although he only reported back pain periodically over the relevant period, it seems that after he stopped working, Plaintiff was able to

adjust his standing, walking, and lifting activities so as not to precipitate his pain as often. This is reflected in his testimony that he could do simple chores around his house like working in the kitchen and doing laundry, "and then maybe within a half hour, if I'm doing them steadily, I have to sit down." Tr. at 40. It is also reflected in his testimony that he tried not to lift over 20 pounds and used a golf cart and a bag drop when playing golf. Tr. at 448. Plaintiff also testified that he engaged in chores like housework and yardwork for an hour to an hour-and-a-half. Tr. at 448–49. The ALJ did not explain how Plaintiff's ability to perform the referenced activities, with the qualifications he indicated, suggested his impairment was not as severe as he alleged.

The ALJ's assessment of Plaintiff's subjective allegations is not supported by substantial evidence given his failure to explain how the evidence he cited supported his conclusions.

### 4. Ability to Perform PRW

Plaintiff argues that substantial evidence does not support the ALJ's conclusion that he could perform his PRW as a garbage collections driver. [ECF No. 15 at 29]. He maintains the ALJ's error in assessing his RFC led to the erroneous conclusion that he could perform his PRW. *Id.* at 30–31.

The Commissioner argues Plaintiff is merely reiterating his argument as to the ALJ's assessment of the RFC for medium work. [ECF No. 17 at 25].

He notes the record contains evidence to suggest Plaintiff stopped working to "retire" and while working, "no longer assisted with lifting" after developing back pain, although the "bouncing and jostling" of the seats exacerbated his pain. *Id.* at 25–26. He claims that even if the ALJ erred in finding Plaintiff could perform his PRW, he cited other medium jobs that Plaintiff could perform. *Id.* at 26, 28.

A claimant is "not disabled" if his RFC permits him to meet the physical and mental demands of PRW as actually performed or as described by the *DOT* as customarily performed throughout the economy. SSR 82-62. To determine a claimant's ability to perform PRW, the ALJ must carefully evaluate the claimant's statements as to which PRW requirements can no longer be met and the reasons for his inability to meet those requirements; medical evidence establishing how the impairments limit the claimant's ability to meet the physical and mental demands of the work; and, in some, cases, supplementary or corroborative information from other sources such as employers, the *DOT*, etc., on the requirements of work as generally performed in the economy. *Id.* The ALJ must make the following specific findings of fact to support a determination that the claimant can perform his PRW: (1) a finding of fact as to his RFC; (2) a finding of fact as to the physical and mental demands of his PRW; and (3) a finding of fact that his RFC would permit a return to his PRW. *Id.*

53

As discussed above, the ALJ made a flawed finding as to Plaintiff's RFC. Tr. at 425. He wrote the following as to Plaintiff's PRW: "The vocational expert testified that the claimant is capable of performing his past relevant work as a garbage collections driver (Dictionary of Occupational Titles (DOT) # 361.684-014[7]), which the Dictionary of Occupational Titles classifies as having a medium exertional level, and is semi-skilled with an SVP of 3." Tr. at 429. Thus, the ALJ only addressed the physical and mental demands of Plaintiff's PRW to the extent that he noted the *DOT* described the job as requiring medium exertion with an SVP of 3. *See id.* He did not address the physical and mental demands of Plaintiff's PRW with specificity and did not evaluate the claimant's statements as to which of the requirements of his PRW that he could no longer meet and his reasons for his inability to meet those requirements, as required pursuant to SSR 82-62. The ALJ made a finding of fact that Plaintiff's RFC would allow for performance of his PRW, writing: "In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant was able to perform it as actually and generally performed." *Id.*

---

[7] The ALJ cited the wrong *DOT* number for Plaintiff's PRW. The *DOT* number he provided in the decision was consistent with that of a laundry worker. 361.684-014. LAUNDRY WORKER, I. DOT (4th ed., Rev. 1991). 1991 WL 672983. Both VEs identified Plaintiff's PRW as that of a garbage collector driver, *DOT* number 905.663-010. Tr. at 43, 452.

The undersigned agrees with the Commissioner's assessment that Plaintiff is essentially reiterating his challenge to the RFC assessment in alleging the ALJ erred in concluding he could perform his PRW. Nevertheless, because the ALJ erred in assessing an RFC for medium work, he consequently erred in finding Plaintiff could perform his PRW and other jobs at the medium exertional level. Substantial evidence does not support a finding that an individual's RFC would allow for performance of his PRW where the RFC assessment is not supported by substantial evidence.

The Commissioner appears to argue that Plaintiff retained the ability to perform his PRW as actually performed because he was not having to engage in heavy lifting after developing problems with his back. [ECF No. 17 at 25–26]. In support of his argument, he cites to the transcript at pages 442, 444, 446–47, and 500. The undersigned's review of these records fails to corroborate the Commissioner's claim, as Plaintiff did not testify that he stopped lifting after developing back pain. He testified: "At big stops I would get out and help the guys on the back, so it was intermittently, but it was at least ten times during the course of the day." Tr. at 442–43. In response to further questioning, Plaintiff stated "some things weighed 50 pounds or more," including "[c]ans, bags, bulk items such as sofas, mattresses," "refrigerators," and "stoves." Tr. at 443. He further testified that "the occasional lifting" and "bouncing in the truck" were the reasons he was

unable to return to his job as a garbage truck driver. Tr. at 446. Plaintiff's testimony does not support a finding that he remained capable of performing his PRW as he performed it. It also does not suggest that the job was performed at less than the medium exertional level.

In light of the foregoing, the ALJ erred in concluding at step four that Plaintiff could perform his PRW.

### 5.     Grid Rule 202.06

Plaintiff argues that because he could not perform his PRW and was limited to light work, the court should direct the Commissioner to award benefits based on application of Grid Rule 202.06. [ECF No. 15 at 32–33]. He notes the case has already been remanded once and additional proceeding would be of limited value, as the record is fully developed for the period prior to his date last insured of December 31, 2018. *Id.* at 34.

The Commissioner maintains remand for an award of benefits is not warranted, as Plaintiff has not proven that he had greater limitations than those assessed by the ALJ. [ECF No. 17 at 15, 29].

"Whether to reverse and remand for an award of benefits or remand for a new hearing rests within the sound discretion of the district court." *Smith v. Astrue*, C/A No. 10-66-HMH-JRM, 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011) (citing *Edwards v. Bowen*, 672 F. Supp. 230, 237 (E.D.N.C. 1987)). "The Fourth Circuit has explained that outright reversal—without remand for

further consideration—is appropriate under sentence four 'where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose'" and "where a claimant has presented clear and convincing evidence that he is entitled to benefits." *Goodwine v. Colvin*, C/A No. 3:12-2107-DCN, 2014 WL 692913, at *8 (D.S.C. Feb. 21, 2014) (citing *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974); *Veeney ex rel. Strother v. Sullivan*, 973 F.3d 326, 333 (4th Cir. 1992). An award of benefits is appropriate when "a remand would only delay the receipt of benefits while serving no useful purpose, or a substantial amount of time has already been consumed." *Davis v. Astrue*, C/A No. 07-1621-JFA, 2008 WL 1826493, at *5 (D.S.C. Apr. 23, 2008) (citing *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984); *Tinnant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982). "On the other hand, remand is appropriate 'where additional administrative proceeding could remedy defects . . . .'" *Id.* (quoting *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989)).

The Grid Rules may direct a finding that a claimant is disabled if the individual's impairments prevent him from performing his PRW and he meets specific criteria as to maximum sustained work capability, age, education, and previous work experience. 20 C.F.R. Pt. 404, Subpt. P., App'x 2, § 200.00(a). Grid Rule 202.06 directs a finding that a claimant is disabled if

the following conditions are met: (1) the individual must have a maximum sustained work capability limited to light work as a result of severe medically-determinable impairments; (2) the individual must be of advanced age; (3) the individual must be a high school graduate or more, but must not have attained education that allows for direct entry into skilled work; and (4) the individual must have a history of skilled or semiskilled work, but cannot have skills that are transferable to light work. 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 202.06.

During the relevant period, Plaintiff was of advanced age and had a high school education and a history of semiskilled work without transferable skills, according to both VEs. *See* Tr. at 43, 453. Therefore, if the record unequivocally supports a finding that he was limited to work at the light exertional level or less, Grid Rule 202.06 directs a finding that he is disabled.

The undersigned has considered that the case was previously remanded and, given that Plaintiff was last insured for DIB prior to the ALJ's most-recent decision, it does not appear that it would be useful to reopen the record for additional evidence. Based on the record before the court, the undersigned concludes that a remand for further administrative proceedings would be futile because the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard.

In reaching this conclusion, the undersigned closely examined Dr. Jenouri's report and opinion, as the ALJ gave it "significant weight" in assessing Plaintiff's RFC. Dr. Jenouri's report states "[n]o restrictions based upon the findings of today's evaluation." Tr. at 281. A review of the report suggests that Dr. Jenouri reviewed no imaging reports or other records related to Plaintiff's back pain in reaching his conclusion. *See* Tr. at 279–81 (referencing records from Vassar Brothers hospital from 2005 for a kidney stone and 2008 and 2013 for colonoscopies and indicating "[n]one pending" as to "LABS AND OTHER TESTING"). He based his opinion on a one-time examination that showed mostly normal findings, but slightly-reduced ROM of the lumbar spine and hips and positive SLR on the left in the seated position. Tr. at 280–81. It is impossible to know if Dr. Jenouri's opinion would have been the same if he had reviewed the 2012 MRI report, but his failure to do so suggests his opinion was not fully-informed.

In contrast to Dr. Jenouri's opinion, the record contains opinions from two treating physicians who suggested that Plaintiff could not meet the exertional requirements of medium work. Although Dr. Levin did not set forth specific lifting restrictions, he indicated Plaintiff should not continue to perform the "lifting and carrying activities" of his PRW, which was performed at the medium exertional level. Tr. at 254. Dr. Mason specified that Plaintiff's had lifting and carrying abilities consistent with light work and could rarely

or never lift 21 pounds or more, which would rule out completion of work at the medium exertional level. *See* Tr. at 354. Plaintiff's testimony that he tried not to lift over 20 pounds, Tr. at 42, 448, further supported a finding that he was limited to work at the light exertional level, at most.

Plaintiff has presented clear and convincing evidence that he had a maximum sustained work capability limited to light work over the relevant period. Therefore, Grid Rule 202.06 directs a finding that he was disabled beginning on his amended alleged onset date of January 5, 2013.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the finds that the Commissioner's decision is not supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for an award of benefits pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

March 12, 2021                                          Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge